United States Court of Appeals,

Eleventh Circuit.

No. 96-8792.

Ligia PACHECO DE PEREZ, individually, et al., Plaintiffs-Appellants,

v.

AT&T COMPANY, et al., Defendants-Appellees.

Cruz SIGALA, and Norma Sofia De Sigala, individually and on behalf of the Estate of Cruz Fernando Sigala and Monica Huornug, as Succession Representative of Cruz Fernando Sigala, Plaintiffs-Appellants,

v.

AT&T COMPANY, et al., Defendants-Appellees.

April 29, 1998.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:95-CV-2749-FMH), Frank M. Hull, Judge.

Before BLACK and BARKETT, Circuit Judges, and PROPST[*], Senior District Judge.

BARKETT, Circuit Judge:

In these two consolidated cases, plaintiffs-appellants, individuals injured in a 1993 gas pipeline explosion in Venezuela, appeal from the district court's order denying their motion to remand the case to the Georgia state courts and dismissing the action under the doctrine of *forum non conveniens*.

The explosion, which killed fifty people and injured many others, occurred during the laying of fiber-optic cable in the town of Tejerias, Venezuela, when a machine used to dig a trench for the

---

[*]Honorable Robert B. Propst, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

cable struck a gas pipeline. Plaintiffs allege that defendants-appellees AT&T Company ("AT&T"),[1] a New York corporation, and several citizens of Georgia who worked for AT&T, participated in the acts or omissions that caused the explosion.[2]

Before filing the present actions, many of the plaintiffs in this case filed and dismissed actions based on the same claims against the same or similar defendants in other federal district courts. Specifically, most of the plaintiffs brought two diversity tort actions in the United States District Court for the Eastern District of California, which they voluntarily dismissed, and later filed two similar suits in the United States District Court for the District of New Jersey, which they also voluntarily dismissed. The several suits named AT&T, AT&T International, and AT&T Andinos, among others, as potentially liable defendants.[3]

---

[1]Defendant AT&T is listed as "AT&T Company" in the court records, presumably because that is what is listed on plaintiffs' original complaints. The entity is actually "AT&T *Corp.*" We assume that the two entities are the same for purposes of this decision, and refer to the corporate defendant as "AT&T."

[2]The Venezuelan national telephone company subcontracted the cable-laying project to AT&T Andinos, a subsidiary of AT&T International. The Georgia resident employees of AT&T named as individual defendants assisted AT&T Andinos in preparing the bid for the project. AT&T Andinos then subcontracted the trenching portion of the project to Abengoa Venezuela, S.A., a Venezuelan corporation. Abengoa's machine struck the pipeline.

[3]Forty-three of the fifty-six plaintiffs in this case were among the two sets of plaintiffs that twice filed and twice voluntarily dismissed previous suits against AT&T or its subsidiaries for claims arising out of the pipeline explosion. One set of plaintiffs, referred to as the "Relsolelo plaintiffs" by the district court, filed an action in the Eastern District of California against AT&T based on the alleged tortious conduct of AT&T Andinos arising out of the explosion. The Relsolelo plaintiffs voluntarily dismissed their action on March 31, 1994. Several months later, these same plaintiffs sued AT&T International and AT&T Andinos, among others, in New Jersey. The Relsolelo plaintiffs voluntarily dismissed this action on November 18, 1994. A second set of plaintiffs, referred to as the "Rojas plaintiffs" by the district court, filed an action in the Eastern District of California against AT&T International for tortious conduct arising out of the explosion. After voluntarily dismissing that action, the Rojas plaintiffs filed a second action in New Jersey against AT&T International, which they also voluntarily dismissed.

Thereafter, plaintiffs filed two separate actions in Georgia state court, asserting various state law claims against AT&T and the individual employees of AT&T. Defendants removed the cases to the United States District Court for the Northern District of Georgia. The district court consolidated the two actions, denied the plaintiffs' motion to remand, and dismissed the consolidated actions under the doctrine of *forum non conveniens*.

The threshold question on appeal is whether, as the plaintiffs argue, the district court should have remanded the case back to the Georgia state court for lack of federal jurisdiction. Although there is complete diversity among the parties, removal of a case on diversity grounds is not permitted if one or more of the defendants is a citizen of the state in which the suit was originally filed. 28 U.S.C. § 1441(b). Accordingly, because the individual defendants in this case are Georgia citizens, removal would not ordinarily be permitted on diversity grounds. The defendants argue, however, that the presence of the Georgia defendants should not prevent removal of the plaintiffs' lawsuits because the Georgia defendants were fraudulently joined in order to defeat original diversity jurisdiction.

The defendants further assert that federal question jurisdiction exists in this case under four alternative theories. First, the defendants maintain that the plaintiffs' attempt to "artfully plead" their state-law complaint so as to avoid the preclusive effect of the voluntary dismissals of their prior federal lawsuits presents a substantial federal question sufficient to support federal jurisdiction. Second, they argue that the plaintiffs' complaint presents a substantial federal question because the plaintiffs must rely on a federal treaty to prove that they have standing to proceed in the Georgia state courts. Third, the defendants argue that the lawsuit involves the federal common law of foreign relations because the litigation implicates the national interests of Venezuela. Fourth, the defendants

3

assert that the district court had the authority to exercise supplemental jurisdiction over this case under the All Writs Act, 28 U.S.C. § 1651, to prevent frustration of orders made in related lawsuits pending before the same district court judge.[4]

We conclude that federal question jurisdiction does not exist under any of the defendants' theories. We further conclude that the record does not support the defendants' assertion of fraudulent joinder of the Georgia resident defendants. Because federal jurisdiction is lacking in this case, the district court should have granted the plaintiffs' motion to remand.[5]

---

[4]Defendants suggest that we need not reach the difficult and complex issues of federal question jurisdiction and fraudulent joinder because resolution of the *forum non conveniens* issue is much simpler. Defendants argue that because there is original diversity jurisdiction in this case, and because removal by the resident defendants is a procedural, and not a jurisdictional, defect, *see, e.g., Korea Exchange Bank v. Trackwise Sales Corp.,* 66 F.3d 46, 50 (3d Cir.1995); *Borg-Warner Leasing v. Doyle Elec. Co.,* 733 F.2d 833, 835 n. 2 (11th Cir.1984), we can exercise our discretion to affirm the district court's *forum non conveniens* ruling without reaching the intricacies of federal question jurisdiction and fraudulent joinder. Defendants point to cases in which courts have avoided questions of subject matter jurisdiction where the jurisdictional issue is difficult and "the case may be disposed of on a simpler ground." *Cantor Fitzgerald, L.P. v. Peaslee,* 88 F.3d 152, 155 (2d Cir.1996). We are not persuaded by the defendants' arguments. First, that removal of a case with resident defendants is a procedural defect does not render that defect meaningless; rather, the defect is *waivable,* and in this case the plaintiffs have not waived their objection to removal on the grounds that some of the defendants are Georgia residents. Second, the Supreme Court has recently declined to endorse the approach taken by some of the courts of appeals of assuming jurisdiction for the purpose of passing upon the merits of an action. *See Steel Co. v. Citizens for a Better Environment,* --- U.S. ----, 118 S.Ct. 1003, --- L.Ed.2d ---- (1998) (rejecting the so-called "doctrine of hypothetical jurisdiction"). Important jurisdictional questions cannot be ignored merely because they are difficult. To do otherwise would allow defendants to evade the statutory requirements of § 1441(b) and allow the federal courts to make significant dispositive rulings in a case over which the federal courts may lack jurisdiction.

[5]The district court based its assumption of jurisdiction over this case upon the defendants' first two theories of federal jurisdiction, and did not address the defendants' other theories. Because the district court did not reach the remaining theories, at least one of which (the fraudulent joinder issue) ordinarily requires an underlying factual determination, the dissent believes that we should allow the district court to consider these possible bases for federal jurisdiction in the first instance. We are mindful of the general rule that a court of appeals will not consider issues

4

I. Background Principles

We review the district court's denial of the plaintiffs' motion to remand, which involves questions of federal subject matter jurisdiction, *de novo. See BIW Deceived v. Local S6, Ind. Union of Marine and Shipbuilding Workers of America,* 132 F.3d 824 (1st Cir.1997) (subjecting denial of motion to remand to *de novo* review); *Tapscott v. MS Dealer Serv. Corp.,* 77 F.3d 1353, 1356 (11th Cir.1996) (holding that subject matter jurisdiction determinations are subject to *de novo* review). In a motion to remand, the removing party bears the burden of showing the existence of federal jurisdiction. *Diaz v. Sheppard,* 85 F.3d 1502, 1505 (11th Cir.1996). We construe removal jurisdiction narrowly and resolve any doubts regarding the existence of federal jurisdiction in favor of the non-removing party, in this case the plaintiffs, *Diaz,* 85 F.3d at 1505.

---

not reached by the district court, especially where the issues involve questions of fact. *See, e.g., Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Stewart v. Dep't of Health and Human Serv.,* 26 F.3d 115, 115-16 (11th Cir.1994). This rule is pragmatic in nature, however, and is "not a jurisdictional limitation." *Ochran v. United States,* 117 F.3d 495, 502 (11th Cir.1997) ("[A]lthough the general rule is that we do not address arguments that were not addressed by the district court, we unquestionably have the discretion to do so."). Based upon the particular circumstances presented by this case, we conclude that it is appropriate to exercise our discretion to reach the jurisdictional theories not addressed by the district court. This is not a case where the parties failed to raise the arguments below—both sides vigorously argued each theory before the district court, and offered evidence in support of their respective positions. Indeed, AT&T, the party who bears the burden of proving the existence of federal jurisdiction, does *not* argue on appeal that the case should be remanded for further consideration; rather, AT&T contends that the record fully supports each of its alternate theories of jurisdiction. The voluminous record in this case more than adequately sets forth the factual and legal grounds for the parties' arguments on each of the jurisdictional theories. In these circumstances, concerns of judicial economy and fairness to the parties counsel in favor of our disposing of all of the defendants' asserted grounds of federal jurisdiction. *See id.* (noting that judicial economy would not be served by remanding case to district court where both parties had briefed the issue and the court had expended considerable time analyzing claim not considered by the district court).

An action filed in state court may be removed to federal court based upon diversity or federal question jurisdiction. 28 U.S.C. § 1441(a), (b). Diversity will not support removal jurisdiction, however, if any of the properly joined defendants are citizens of the state in which the suit was originally filed. *See id.* § 1441(b). The citizenship of the parties does not matter if there is federal question jurisdiction. *Id.* Federal question jurisdiction exists if the plaintiffs' suit "arises under" the "Constitution, treaties or laws of the United States." *Id.;* 28 U.S.C. § 1331. In general, a case "arises under" federal law if federal law creates the cause of action, or if a substantial disputed issue of federal law is a necessary element of a state law claim. *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9-10, 13, 103 S.Ct. 2841, 2846, 2848, 77 L.Ed.2d 420 (1983). The determination of whether federal question jurisdiction exists must be made on the face of the plaintiff's well-pleaded complaint; an anticipated or even inevitable federal defense generally will not support removal based upon federal question jurisdiction. *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392-93, 107 S.Ct. 2425, 2429-30, 96 L.Ed.2d 318 (1987).

II. Four Alternative Theories of Federal Question Jurisdiction

A. Res Judicata

The defendants first argue that the plaintiffs' attempt to avoid the preclusive effect of their prior federal lawsuits by "artfully pleading" their complaint to contain only state law claims creates a federal issue sufficient to support federal jurisdiction in this case. The district court accepted this argument, holding that the doctrine of res judicata provides one alternative ground for federal subject matter jurisdiction over the plaintiffs' suit. Specifically, the district court found that those plaintiffs who had twice filed and twice dismissed the prior actions in other federal courts could not

6

avoid the preclusive effect of the "two dismissal" rule of Federal Rule of Civil Procedure 41(a)(1).[6]

Under Rule 41(a)(1), a second voluntary dismissal of a complaint operates as an adjudication on the merits that has a preclusive effect in subsequent litigation. While noting that the prior suits were brought against AT&T International and its Venezuelan subsidiary—and not AT&T Corp.—the district court concluded that AT&T Corp. and AT&T International were in "privity" with one another so as to permit AT&T Corp. to assert the preclusive effect of Rule 41(a)(1) in this litigation. Construing the plaintiffs' current suit as an attempt to make an "end run" around the prior federal adjudication, the district court determined that it had removal jurisdiction in order to prevent this type of forum shopping, and exercised supplemental jurisdiction over those parties and claims who were not bound by the two dismissal rule.

On appeal, the plaintiffs argue that the district court committed clear error in finding AT&T Corp. in privity with AT&T International on the sole basis that AT&T International is a wholly-owned subsidiary of AT&T Corp. *See Hart v. Yamaha-Parts Distrib., Inc.,* 787 F.2d 1468, 1472-73 (11th Cir.1986) (holding that the determination of whether a parent company and its subsidiary are in privity for res judicata purposes must be based upon specific facts showing that the two entities are "alter egos" of each other). Plaintiffs further argue that, even if the two corporations are in privity, a defense of res judicata will not support federal question jurisdiction.

We need not address the privity question, as the recent Supreme Court decision in *Rivet v. Regions Bank of Louisiana,* --- U.S. ----, 118 S.Ct. 921, --- L.Ed.2d ---- (1998), explicitly holds that

---

[6]Rule 41(a)(1) provides that "[u]nless otherwise stated in the notice of dismissal or stipulation, the dismissal [under this Rule] is without prejudice, except that a notice of dismissal operates as an adjudication on the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim." Fed.R.Civ.P. 41(a)(1).

"claim preclusion by reason of a prior federal judgment is a defensive plea that provides no basis for removal under [28 U.S.C.] § 1441(b)." Before *Rivet* was decided, a number of courts of appeals had interpreted a footnote to the Supreme Court's decision in *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 2427 n. 2, 69 L.Ed.2d 103 (1981), as providing a ground for federal jurisdiction based upon the preclusive effect of a prior federal judgment. *See, e.g., Rivet,* (collecting cases). In *Rivet,* however, the Court clarified "that *Moitie* did not create a preclusion exception to the rule, fundamental under currently governing legislation, that a defendant cannot remove on the basis of a federal defense." *Id.* at ----, 118 S.Ct. at 926. Therefore, whether or not AT&T can claim the preclusive benefit of the plaintiffs' prior voluntary dismissals, the defendants' argument that such a defense of preclusion confers federal jurisdiction over this case is foreclosed by *Rivet.*

B. Do Plaintiffs' Claims "Arise Under" a Federal Treaty?

Defendants next argue, as their second basis for removal jurisdiction, that an essential part of the plaintiffs' causes of action requires interpretation of a federal treaty. Specifically, defendants contend that plaintiffs' success on their state law claims depends upon an interpretation of the Treaty of Peace, Friendship, Navigation, and Commerce between the United States and Venezuela, Jan. 20, 1836, 8 Stat. 466, which provides Venezuelan citizens with access to the courts of the United States. According to the defendants, the treaty is implicated in this case because of a provision of the Georgia civil code which states that:

> The citizens of other states of the United States or of foreign states at peace with this state shall, by comity, be allowed the privilege of suing in the courts of this state and of giving evidence therein, as long as the same comity is extended in the courts of the other states to the citizens of this state.

8

Ga.Code. Ann. § 1-2-10 (1990). Defendants argue that under § 1-2-10, plaintiffs cannot proceed on their tort actions in the Georgia state courts without showing that the Venezuelan courts extend the requisite comity to Georgia citizens, and that in order to make this showing, the plaintiffs must rely on the treaty. The district court accepted the defendants' argument, and held that "[b]ecause Plaintiffs' standing—a critical element of their causes of action—is determined by interpretation of a treaty, a substantial federal question is presented on the face of Plaintiffs' Complaint, and removal is proper." District Court Opinion at 7.[7]

In reaching its conclusion, the district court relied upon *Kern v. Jeppesen Sanderson, Inc.,* 867 F.Supp. 525 (S.D.Tex.1994), which held that a similar provision of Texas law required an interpretation of an international treaty on the issue of standing and, therefore, a substantial federal issue was presented by the plaintiffs' state law complaint. The holding in *Kern,* however, has been rejected by the Fifth Circuit. *See Torres v. Southern Peru Copper Corp.,* 113 F.3d 540, 542 (5th Cir.1997). In *Torres,* the Fifth Circuit considered the same provision of the Texas civil code, which authorizes wrongful death actions brought by citizens of foreign nations provided that "the country has equal treaty rights with the United States on behalf of its citizens." Tex. Civ. Prac. & Rem. § 71.031 (Vernon 1986). The Fifth Circuit rejected the reasoning set forth in *Kern,* stating:

> At the outset we reject [the defendant's] contention that Tex. Civ. Prac. & Rem.Code § 71.031 confers federal question jurisdiction.... The mere fact that section 71.031 requires a Texas state court to examine treaties to determine whether a plaintiff has standing is insufficient by itself to create federal jurisdiction.

*Torres,* 113 F.3d at 542.

---

[7]We use the term "standing" because that is how the parties and some courts refer to the ability of a plaintiff to proceed in state court under statutes like the one in Georgia. As used in this opinion, however, "standing" does not refer to Article III standing, which implicates the subject matter jurisdiction of the federal courts.

In this case, we agree with the Fifth Circuit. We conclude that the need to look to the treaty to satisfy the Georgia code provision does not present a federal question substantial enough to place the plaintiffs' state law tort actions within the jurisdiction of the federal courts. As the Supreme Court has emphasized, "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow Pharm., Inc. v. Thompson,* 478 U.S. 804, 813, 106 S.Ct. 3229, 3234, 92 L.Ed.2d 650 (1986). Defendants argue that because resolution of the treaty issue may determine whether the plaintiffs could proceed at all on their causes of action, the federal issue is essential to plaintiffs' state law actions. While this argument has superficial appeal, it does not withstand the careful scrutiny required of courts conducting an inquiry into federal jurisdiction.[8]

We find instructive the Supreme Court's decision in *People of Puerto Rico v. Russell,* 288 U.S. 476, 53 S.Ct. 447, 77 L.Ed. 903 (1933), in which the Court held that federal jurisdiction was lacking where the plaintiff's right to proceed in the courts on its state law based cause of action was authorized by a federal statute.[9] In *Russell,* the Court stated that:

---

[8]In *Merrell Dow,* the Court rejected a "bright-line" approach to federal question jurisdiction, stating that "[t]here is no "single, precise definition' of that concept; rather, "the phrase "arising under" masks a welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system.' " *Id.* at 808, 106 S.Ct. at 3232 (quoting *Franchise Tax Bd.,* 463 U.S. at 8, 103 S.Ct. at 2845).

[9]*Russell* involved the attempt by the government of Puerto Rico to collect taxes from corporations and the resistance of those entities to the territory's efforts. Initially, the corporations filed suit in federal district court in Puerto Rico seeking injunctions against the collection of taxes. Congress passed a law forbidding such suits. The Supreme Court then declared that the previous injunction cases were abated by the statute, and the initial lawsuits were dismissed. Subsequently, Congress enacted a statute giving Puerto Rico the power to collect the taxes at issue in the prior cases in suits at law, rather than through summary process. The respondents argued that because the authority to proceed in the courts on the enforcement action came from federal law, the suit was one arising under the laws of the United States.

10

> Federal jurisdiction may be invoked to vindicate a right or privilege claimed under a federal statute. It may not be invoked where the right asserted is nonfederal, merely because the plaintiff's right to sue is derived from federal law, or because the property involved was obtained under federal statute. The federal nature of the right to be established is decisive—not the source of the authority to establish it.

*Id.* at 483, 53 S.Ct. at 449-50 (citations omitted). Although factually distinct, *Russell* is analytically analogous. As in *Russell,* the plaintiffs here have a substantive cause of action based in state law, but their right to proceed in a particular court system finds its source in federal law. In both cases, the federal law at issue creates a procedural right of access to the courts that is antecedent to, and separate from, the plaintiffs' state-based substantive cause of action. *See Gully v. First Nat'l Bank in Meridian,* 299 U.S. 109, 116, 57 S.Ct. 96, 99, 81 L.Ed. 70 (1936) ("Here the right to be established is one created by the state. If that is so, it is unimportant that federal consent is the source of state authority."); *cf. Buechold v. Ortiz,* 401 F.2d 371, 372 (9th Cir.1968) (holding that a similar treaty granting access to United States courts but not establishing substantive rights does not create a right "arising under" the treaties of the United States for purposes of 28 U.S.C. § 1331).[10] As the Court in *Gully* explained:

---

[10]In contrast, where a treaty creates substantive rights that form an essential element of a plaintiff's cause of action, federal question jurisdiction will likely exist. In *Hidalgo County Water Control and Improvement Dist. v. Hedrick,* 226 F.2d 1 (5th Cir.1955), for example, the plaintiffs sued defendants to enjoin the latter's use of the waters of the Rio Grande. The municipal plaintiffs had been diverting the waters for irrigation and other community uses and wanted to prevent the private landowner defendants from depleting the river's water source. At common law, however, the defendants, whose land was located adjacent to the river, had priority of right over the plaintiffs, whose land was not adjacent. The plaintiffs argued that a 1945 treaty between the United States and Mexico created and protected the plaintiffs' right to continue to use the waters without interference from the defendants. The court held that it had original federal jurisdiction over the action under 28 U.S.C. § 1331 because the determination of which party would prevail depended upon whether the treaty did indeed confer superior rights upon the plaintiffs. Here, in contrast, the defendants have not shown that the treaty between Venezuela and the United States creates a substantive right that is essential to the plaintiffs' state law cause of action.

11

> If we follow the ascent far enough, countless claims of right can be discovered to have their source or their operative limits in the provisions of a federal statute or in the Constitution itself with its circumambient restrictions upon legislative power. To set bounds to the pursuit, the courts have formulated the distinction between controversies that are basic and those that are collateral, between disputes that are necessary and those that are merely possible.

299 U.S. at 118, 57 S.Ct. at 100. Therefore, although determination of whether the treaty supplies the necessary comity required by the Georgia statute may be in some sense outcome-determinative in plaintiffs' case, we conclude that this is one of those instances where the federal issue is collateral to the essence of plaintiffs' state-law claims.

As with other courts that have found collateral issues of federal law to be insufficient to confer federal jurisdiction over a suit otherwise exclusively based in state law, our holding reflects the concern that whole classes of state law actions should not be "federalized" by the mere presence of a federal issue. This concern has been most clearly expressed in cases involving actions to establish title to land in which the plaintiff must trace the source of the title to federal laws or treaties. *See Shulthis v. McDougal,* 225 U.S. 561, 32 S.Ct. 704, 56 L.Ed. 1205 (1912); *Shoshone Mining Co. v. Rutter,* 177 U.S. 505, 20 S.Ct. 726, 44 L.Ed. 864 (1900); *Mobil Oil Corp. v. Coastal Petroleum Co.,* 671 F.2d 419 (11th Cir.1982); *Mays v. Kirk,* 414 F.2d 131 (5th Cir.1969); *Huckins v. Duval County, Fla.,* 286 F.2d 46 (5th Cir.1960).[11] Here, § 1-2-10 premises the ability of any noncitizen—including citizens of other states, as well as citizens of foreign nations—to sue in the Georgia state courts on reciprocity of access to the courts of the noncitizen's state. One source of such reciprocity between the states is the Privileges and Immunities Clause of the Constitution, which requires each state to provide access to its courts "to the citizens of all other states to the

---

[11]The decisions of the former Fifth Circuit are binding upon this court. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

precise extent that it is allowed to its own citizens." *Chambers v. Baltimore & Ohio RR Co.,* 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907). Under defendants' argument, therefore, every suit by an out-of-state plaintiff could conceivably present a federal question because the plaintiff would have to rely on the Privileges and Immunities Clause to satisfy the requirement of § 1-2-10. We doubt that Georgia meant to "federalize" all actions brought by noncitizens, and we are confident that in these circumstances federal question jurisdiction is lacking.[12]

C. Federal Common Law of Foreign Relations

As their third alternative theory of federal jurisdiction, defendants assert that the plaintiffs' claims implicate the federal common law of foreign relations. The Supreme Court has held that the area of international relations is governed exclusively by federal law. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423-24, 84 S.Ct. 923, 937-38, 11 L.Ed.2d 804 (1964) (holding that application of "act of state doctrine," which precludes courts of this country from questioning the validity of acts of a foreign government committed within its own territory, is governed by federal law); *see also Texas Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 641, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981) (noting that the narrow realm of federal common law includes "international disputes implicating ... our relations with foreign nations"). Where a state law action

---

[12]We find further support for our conclusion in the Second Circuit's decision in *Travelers Indemnity Co. v. Sarkisian,* 794 F.2d 754, 762 (2d Cir.1986). In *Sarkisian,* the Second Circuit rejected the argument that a New York law providing that out-of-state judgments were enforceable only to the extent of the Full Faith & Credit Clause created a substantial question of federal law. The court first noted the reluctance of the courts in the land title cases to federalize whole classes of state-law actions. "Because it would be equally anomalous to federalize every action seeking to enforce an out-of-state judgment, Travelers' state court complaint is not removable simply because the plaintiff expects compliance with the Full Faith and Credit Clause.... To whatever extent New York has thereby made observance of the Full Faith and Credit Clause an element of plaintiff's cause of action, this "federal' element is too insubstantial to support federal question jurisdiction." *Id.*

13

has as a substantial element an issue involving foreign relations or foreign policy matters, federal jurisdiction is present. *Republic of Philippines v. Marcos,* 806 F.2d 344, 353 (2d Cir.1986) (holding that "there is federal question jurisdiction over actions having important foreign policy implications"). The cases addressing this area of federal common law generally involve disputes in which a foreign government, or its instrumentality, is a named party to the lawsuit, or where the actions of a foreign government are a direct focus of the litigation. *See Sabbatino,* 376 U.S. at 404-406, 84 S.Ct. at 928-29 (involving a contract dispute between the defendants and the Cuban National Bank regarding Cuba's expropriation of sugar owned by the defendants); *Republic of Philippines,* 806 F.2d at 353 (allegations in the complaint "concern efforts by a foreign government to reach or obtain property located" in the United States); *Republic of Iraq v. First Nat'l City Bank,* 353 F.2d 47 (2d Cir.1965) (holding that attempt by Republic of Iraq to recover assets held in the United States was governed by federal law).

The Fifth Circuit has extended the area of federal jurisdiction based on the federal common law of foreign relations to disputes between private parties that implicate the "vital economic and sovereign interests" of the nation where the parties' dispute arose. *Torres,* 113 F.3d at 543 n. 8.[13] In *Torres,* over 700 Peruvian plaintiffs sued the defendant mining company ("SPCC") in Texas state court alleging that they had been harmed by the SPCC's copper smelting operations conducted in Peru. After SPCC removed to federal court, the district court upheld the existence of federal

---

[13]*See also Marathon Oil Co. v. Ruhrgas,* 115 F.3d 315 (5th Cir.1997), *petition for reh'g en banc granted,* 129 F.3d 746 (Nov. 17, 1997). In *Marathon Oil,* the same panel that authored the *Torres* opinion reiterated its holding that where a plaintiff's claims implicate the vital interests of a foreign nation, federal jurisdiction is present. In *Marathon Oil,* however, the court found that the interests of Germany in the international commercial dispute were not so substantial as to confer federal jurisdiction over the action. Given the pendency of *Marathon Oil* before the Fifth Circuit en banc, the status of this decision is unclear.

14

jurisdiction and dismissed the case on the basis of *forum non conveniens*. Pending appeal, the government of Peru filed a protest letter with the State Department and submitted an amicus brief to the Fifth Circuit. Noting that the mining industry in Peru "is critical to that country's economy," and that the Peruvian government had actually participated in some of the activities for which the defendant was being sued, the court concluded that "[t]his action therefore strikes not only at vital economic interests but also at Peru's sovereign interests by seeking damages for activities and policies in which the government actively has been engaged." *Id.* at 543.

Citing *Torres,* defendants argue that the plaintiffs' action implicates the economic and sovereign interests of Venezuela to such a significant extent that federal jurisdiction based upon the federal common law of foreign relations exists in this case. Defendants note that the factors considered by the Fifth Circuit in this jurisdictional inquiry include whether the injuries occurred on foreign soil, whether the foreign government's policy decisions or actions are brought into question by the suit, whether the foreign government was involved in the alleged wrongdoing, and whether the action strikes at the heart of the economic and sovereign interests of the foreign nation. *See id.* at 543. Defendants assert that the record shows that the plaintiffs' injuries occurred only in Venezuela; that the gas pipeline that exploded was owned and operated by a government-owned Venezuelan corporation; that the cable-laying project was initiated by the national telephone company, 49% of which is owned by the Venezuelan government, and that a ministry of the government was responsible for the issuing of permits for the fiber-optic cable project; that the plaintiffs' action calls into question the laying of the gas pipeline, an act done by the government-owned corporation; that the Venezuelan National Congress has conducted hearings into the accident; and that the fiber-optic cable project is "vital" to the Venezuelan economy. All of

15

these factors, the defendants argue, support a finding that the substantial interests of Venezuela are implicated by this litigation and that, therefore, federal jurisdiction is proper.

We conclude that the federal common law of foreign relations will not support federal jurisdiction in this case. First, although the court in *Torres* stated "[t]hat Peru has injected itself into this lawsuit does not, standing alone, create a question of federal law," 113 F.3d at 542-43, we think it significant, for purposes of this case, that the Venezuelan government has taken no position on whether this lawsuit proceeds in the United States or in Venezuela. Without such an indication from the sovereign nation, we are reluctant to find that the plaintiffs' private cause of action sounding in Georgia tort law implicates important foreign policy on the face of the plaintiffs' pleadings. It seems more likely to us that any issues involving the participation of the Venezuelan government, or its corporate entities, will arise in the form of a defense by AT&T. Federal question jurisdiction, however, cannot be based upon a federal defense. *See Aquafaith Shipping, Ltd. v. Jarillas,* 963 F.2d 806, 808 (5th Cir.1992) (holding that where the issue of federal relations is raised by the defendant's pleadings, and is not apparent on the face of the plaintiff's complaint, there is no federal question jurisdiction).

Second, we find that the evidence regarding Venezuela's interests in the plaintiffs' action is too speculative and tenuous to confer federal jurisdiction over this case. In emphasizing that the plaintiffs' action implicated the vital economic and political interests of Peru, the court in *Torres* found that:

> [t]he mining industry in Peru, of which SPCC is the largest company, is critical to that country's economy, contributing up to 50% of its export income and 11% of its gross domestic product. Furthermore, the Peruvian government has participated substantially in the activities for which SPCC is being sued. By way of example, the government: (1) owns the land on which SPCC operates; (2) owns the minerals which SPCC extracts; (3) owned the Ilo refinery from 1975 until 1994, during which time pollution from the refinery may

16

have contributed to the injuries complained of by plaintiffs; and (4) grants concessions that allow SPCC to operate in return for an annual fee. Moreover, the government extensively regulates the mining industry.

113 F.3d at 543. In this case, by contrast, while the record shows that Venezuelan governmental entities or corporations partially owned by the government participated in activities that *may* have had an effect on the events giving rise to the explosion, the evidence of Venezuela's direct participation in any tortious actions is weaker than the evidence of the Peruvian government's involvement in *Torres,* and there is no evidence regarding the relative importance of the fiberoptic cable project, or the telecommunications industry in general, to the Venezuelan national economy. Although this litigation might significantly affect *AT&T*'s business operations in Venezuela, it is not clear that the lawsuit threatens the economic vitality of Venezuela itself. While we do not doubt that gas pipeline explosion was a significant event in Venezuela, we conclude that the defendants have failed to show that the plaintiffs' complaints are so intertwined with the sovereign interests of Venezuela as to place this case within the purview of the federal courts.

D. All Writs Act

Defendants argue that the All Writs Act, 28 U.S.C. § 1651, furnishes an alternative basis for federal jurisdiction over this case. The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. § 1651(a). The Supreme Court "has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. New York Tel. Co.,* 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977). Defendants acknowledge that the All Writs Act does not provide

an independent basis for federal jurisdiction. *See Westinghouse Elec. Corp. v. Newman & Holtzinger, P.C.,* 992 F.2d 932, 937 (9th Cir.1993). Defendants argue, however, that the district court had the authority under the Act to accept jurisdiction over the plaintiffs' suits to protect orders issued by the court in a related action. Specifically, three of the fifty-six plaintiffs in this action—Carmen Mercedes Armas, Francisco Alvarez and Omika Evangelino Santos Melendez—were the named plaintiffs in *Armas et al. v. AT & T,* No. 95-cv-1430-FMH (N.D.Ga.), a case pending before the same district court judge at the time the *De Perez* suits were removed.[14] The district court entered several orders in the *Armas* case granting more limited discovery than requested by the *Armas* plaintiffs. Defendants contend that the plaintiffs in the present action—a group which includes the three *Armas* plaintiffs-filed their suit in Georgia state court in order to avoid these discovery orders, and that the district court could have exercised its discretionary authority under the All Writs Act to assume supplemental jurisdiction over the claims and parties in the *De Perez* litigation. Defendants do not explain, however, how the plaintiffs' filing suit in state court would interfere with the discovery orders made in the *Armas* action.

---

[14]The *Armas* action was originally filed by the "Relsolelo" plaintiffs, *see supra* note 3, in the United States District Court for the Eastern District of California. On March 28, 1994, most of the plaintiffs in that action filed a notice of voluntary dismissal, leaving only Armas, Alvarez and Melendez. The *Armas* action proceeded in the California district court and was subsequently transferred to the United States District Court for the Northern District of Georgia. The district court entered several discovery and other procedural orders in the *Armas* action, and eventually dismissed the case *forum non conveniens* grounds. While the *Armas* action was pending, the plaintiffs in this case, including those who had voluntarily dismissed their claims in the *Armas* action in California district court, filed their two separate actions in Georgia state court. The three plaintiffs in the *Armas* action also joined the suits in Georgia state court, which were eventually removed to the same federal district court as the *Armas* case. Although Armas, Alvarez and Santos were plaintiffs in both actions pending before the same district court judge, the judge specifically declined to consolidate the *De Perez* actions with the *Armas* suit.

18

Some courts of appeals have held, in the context of complex class actions in which a final settlement agreement has been reached, and a subsequent or concurrent state court action threatens the viability of this final agreement, that a district court may exercise its authority under the All Writs Act to remove an otherwise unremovable case from state court and to enjoin further proceedings in that case in order to prevent frustration of the settlement agreement. *See In re VMS Securities Litigation,* 103 F.3d 1317, 1323-24 (7th Cir.1996) (upholding the district court's assumption of jurisdiction over a state action under the All Writs Act in order to protect the court's ongoing orders and prior rulings in complex class action litigation over which the court "expressly retained jurisdiction"); *In re Agent Orange Product Liability Litigation,* 996 F.2d 1425, 1431 (2d Cir.1993) (same). *But see Hillman v. Webley,* 115 F.3d 1461, 1469 (10th Cir.1997) (rejecting the approach taken in *VMS Securities* and *Agent Orange* and holding that the All Writs Act does not provide an independent basis for a district court to acquire jurisdiction over a separate case pending in state court).

We need not decide today whether the approach of the Second and Seventh Circuits in *Agent Orange* and *VMS Securities* or that of the Tenth Circuit in *Hillman* is the correct one, because we conclude that even under the Second and Seventh Circuits' approach, the defendants have not shown the existence of the sort of "exceptional circumstances" that might justify removal of the plaintiffs' lawsuits to federal court where federal jurisdiction is otherwise wholly lacking. *See VMS Securities,* 103 F.3d at 1324; *In re Agent Orange,* 996 F.2d at 1431. As the Second Circuit emphasized in *Agent Orange,* the exercise of authority under the All Writs Act is not appropriate where a district court is "determining simply the preclusive effect of a prior final judgment on claims or issues expected to be raised in subsequent collateral proceedings." *Id.* Rather, a district court's assumption

19

of removal jurisdiction under the Act is proper, if at all, only "to enforce [the court's] ongoing orders against relitigation and to guard the integrity of its prior rulings over which it has expressly retained jurisdiction." *VMS Securities,* 103 F.3d at 1324. We do not see how, at the time of removal, the plaintiffs' prosecution of their action in state court would have interfered with the discovery orders made in the *Armas* action, nor do we see how allowing the plaintiffs to go forward now would thwart the judgment of dismissal for *forum non conveniens* in *Armas.* Any questions about the preclusive effect of judgments made in *Armas* or in other actions on the claims of certain plaintiffs in this case can be resolved by the state court. The fact that a few of the fifty-six plaintiffs in this action may be barred from relitigating their claims, however, does not justify the exercise of supplemental jurisdiction over the entire case under the All Writs Act. We hold that the district court did not have authority under these circumstances to assume jurisdiction under the Act.

III. Fraudulent Joinder

Defendants also argue that the plaintiffs fraudulently joined the Georgia defendants to defeat the original diversity jurisdiction that otherwise exists in this case. "In a removal case alleging fraudulent joinder, the removing party has the burden of proving that either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court." *Crowe v. Coleman,* 113 F.3d 1536, 1538 (11th Cir.1997) (citing *Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1561 (11th Cir.1989)). The burden of establishing fraudulent joinder is a heavy one. Where a plaintiff states even a colorable claim against the resident defendant, joinder is proper and the case should be remanded to state court. *See id.; Cabalceta,* 883 F.2d at 1562. The determination of whether a resident defendant has been fraudulently joined must be based upon the

plaintiff's pleadings at the time of removal, supplemented by any affidavits and deposition transcripts submitted by the parties. *Id.* In making its determination, the district court must evaluate factual allegations in the light most favorable to the plaintiff and resolve any uncertainties about the applicable law in the plaintiff's favor. *Id.*

Although the district court did not address the issue of fraudulent joinder in its order, the parties were afforded the opportunity to present arguments and supporting documents regarding the fraudulent joinder issue. Defendants argued that under Venezuelan law—which they contend governs the plaintiffs' suit—plaintiffs could not possibly establish a cause of action against any of the resident defendants. In support of this argument, defendants submitted to the district court the affidavit of an attorney who practices in Venezuela, who opined that under the so-called Venezuelan doctrine of "adequate cause," the individual AT&T employees could not be held liable for the explosion. Affidavit of Daniel Diquez, R. 3-30, Ex. C. In his affidavit, attorney Diquez stated that under Venezuelan law a plaintiff must establish a causal link between the defendant's acts and omissions and the plaintiffs' damages. Diquez predicted that the Venezuelan courts will not find the individual defendants liable because the explosion could not have been the foreseeable result of the individual defendants' acts and because there were too many intervening acts taken by others to establish the necessary causal link between the acts of the individual defendants and the plaintiffs' damages. Plaintiffs responded that they have adequately alleged claims against the Georgia resident defendants under the law of either Georgia or Venezuela. Specifically, plaintiffs alleged that they joined the resident defendants because those defendants were the AT&T employees directly responsible for planning and surveying the proposed site for laying the fiber-optic cable, and because they performed their duties negligently.

The fact that the plaintiffs may not ultimately prevail against the individual defendants because of an insufficient causal link between the defendants' actions and the plaintiffs' injuries does not mean that the plaintiffs have not stated a cause of action for purposes of the fraudulent joinder analysis. In a fraudulent joinder inquiry, "federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law." *Crowe,* 113 F.3d at 1538. Nothing in the Diquez affidavit, or in the record, suggests that Venezuelan law does not provide a cause of action for the sort of negligence claims asserted against the individual defendants. *Cf. id.* at 1539 (holding remand appropriate where it is "arguable" as to whether Georgia law creates a cause of action against landowner for failure to abate a continuing nuisance created by his property). We conclude that the defendants failed to show that the plaintiffs cannot state an arguable cause of action against the resident defendants. Thus, we cannot say that the Georgia defendants were fraudulently joined.[15]

Conclusion

---

[15]Finally, defendants argue that plaintiffs waived their right to object to removal by engaging in affirmative conduct in the district court. Plaintiffs timely objected to removal and have consistently argued that their action should be remanded to state court. While the plaintiffs' motion to remand and the defendants' motion to dismiss for *forum non conveniens* was pending before the district court, however, the plaintiffs filed a joint status report in which they stated that they understood a previous court order not to bar discovery on the merits of their claims. The plaintiffs stated that they were concerned that the local time limits for discovery would not be tolled during the time the district court was considering the motions to remand and to dismiss. The district court issued an order clarifying its previous order in which it stated that all merits-based discovery would be stayed until the court disposed of the pending motions. Defendants now argue that the plaintiffs' stance in these matters constituted a waiver of their right to object to removal. This argument is not persuasive. The plaintiffs have consistently and insistently maintained that this case should be remanded to state court. We conclude that the plaintiffs' attempt to preserve the timeliness of any possible future discovery cannot be equated with a waiver of their right to object to removal.

For the foregoing reasons, we conclude that the district court lacked federal question jurisdiction and that the plaintiffs' actions were improperly removed to federal court. Therefore, we REVERSE and REMAND this case with directions that the district court remand this action to the State Court of Fulton County, Georgia.

BLACK, Circuit Judge, concurring in part and dissenting in part:

I fully agree with the majority that federal question jurisdiction cannot be predicated on either theory addressed by the district court—res judicata or the federal treaty with Venezuela. Although the majority opinion is thorough and well reasoned, I would remand the case for the district court to determine whether federal question jurisdiction exists based on either the All Writs Act or the federal common law of international relations and whether removal is proper because of fraudulent joinder. *See Citro Florida, Inc. v. Citrovale, S.A.,* 760 F.2d 1231, 1232 (11th Cir.1985). These three theories require an examination of the factual record, a function uniquely within the province of the district court. *Lee v. Celotex Corp.,* 764 F.2d 1489, 1492-93 (11th Cir.1985).